**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**CORRY W. BAKER**                                                     **PLAINTIFF**

**V.**                                    **4:22CV00377 JM**

**ROCK REGION METROPOLITAN**
**TRANSIT AUTHORITY D/B/A**
**ROCK REGION METRO**                                         **DEFENDANT**

<u>ORDER</u>

Pending is Defendant's motion for summary judgment.  (Docket # 19).  Plaintiff filed an untimely response, however, the Court will consider it.  Defendant filed a reply and the matter is ripe for determination.

Plaintiff filed this civil rights action against his employer on April 25, 2022.  Plaintiff, an African American male, was employed by the Defendant for fourteen (14) years.  He was allegedly suspended from his position on July 29, 2021 and subsequently discharged on August 11, 2021 for not wearing his seatbelt.  Plaintiff claims that at the time he was suspended he was on leave pursuant to the Family Medical Leave Act ("FMLA").  He alleges that Defendant violated his rights under the FMLA and discriminated against him on the basis of race in violation of Title VII, 42 U.S.C. § 2000e et seq., and 42 U.S.C. §1981.

<u>Facts</u>

Plaintiff has admitted each of the Defendant's statement of undisputed facts and has submitted his own statement of disputed facts.  Defendant Rock Region Metropolitan Transit Authority d/b/a Rock Region METRO ("METRO') is the public transportation provider for central Arkansas.  In 2007, METRO hired Plaintiff, an African American male, as a Fixed Route Bus Operator.  In that capacity, Plaintiff was responsible for safely operating a bus along a fixed

route, picking up and dropping off passengers and ensuring fares are paid.  From February 2018 until his termination in August 2021, Plaintiff was supervised by METRO Operations Manager John Bohannon.  Bohannon was supervised by METRO Operations Manager Donna Bowers. Both Bohannon and Bowers had the authority to discipline Fixed Route Operators.  Plaintiff acknowledges that over his fourteen-year tenure with METRO, he was never attacked or otherwise injured by a passenger while operating a METRO bus.

METRO's unionized workforce is represented by Local 704 of the Amalgamated Transit Union (the Union). The collective bargaining agreement entered between METRO and the Union on August 23, 2018 permitted METRO to "make reasonable rules and regulations regarding [its] operations, and the concurrent right to monitor employee compliance with said rules and regulations, and to discipline or discharge for just cause if violations occur." Additionally, METRO had the "right to cause compliance with all applicable local, state, and Federal laws and regulations that apply to [it] and/or its employees," and its bargained-for employees are obligated to follow those laws and regulations. At all times relevant to this case METRO required all of its bus operators to wear a seatbelt while operating a METRO bus. Plaintiff was aware of this policy.

On October 9, 2020, Plaintiff was involved in a motor-vehicle collision while driving his bus. METRO pulled video footage from the bus, pursuant to its policies and as is its right under the CBA to review footage of accidents, incidents, and complaints involving its buses and operators.  While METRO determined Plaintiff was not at fault for the collision, the video showed Plaintiff driving his bus while not wearing a seatbelt in violation of METRO policy and the law. On October 23, 2020, Plaintiff received verbal coaching for violating the seatbelt policy and was cautioned that further seatbelt violations would subject him to progressive discipline.

On December 17, 2020, METRO received a complaint from a passenger that Plaintiff was driving his bus without wearing a seatbelt. METRO again pulled and reviewed the video footage and confirmed that Plaintiff was driving the bus without wearing a seatbelt.  On January 5, 2021, METRO issued Plaintiff a written Instruction for violating the seatbelt policy and cautioned him that further seatbelt violations would subject him to progressive discipline.

On January 18, 2021, the Union filed a grievance on Plaintiff's behalf, stating "Mr. Baker feels the seat belts are inadequate protection for drivers because some seat belts get stuck some doesn't work properly and passengers has attacked drivers while stuck in seatbelts Mr. Baker has wrote up seat belts and still have the same issue." The Union asked METRO to "remove the instruction from Mr. Baker and correct the seat belts that could pose a threat to the drivers." METRO held a Step One meeting on March 2, 2021, at which Baker's Union Representative argued that "it was petty of METRO for Corry to get in trouble for not wearing his seatbelt . . . [and without providing specifics] that sometimes seatbelts don't work property and they are written up to be repaired." On March 8, 2021, METRO denied Plaintiff's grievance.

On May 17, 2021, Plaintiff was involved in a second motor-vehicle collision while driving his bus. METRO pulled and reviewed video footage of the incident, which showed Plaintiff operating the bus while not wearing a seatbelt. On June 1, 2021, Plaintiff was issued a written Warning and was cautioned that additional seatbelt violations would subject him to progressive discipline, including suspension and/or termination. Plaintiff did not grieve the written Warning.

On June 17, 2021, METRO received a report from a rider that Plaintiff was operating his bus while not wearing a seatbelt on June 15, 2021.  METRO pulled and reviewed video footage from that day and observed Plaintiff operating his bus while not wearing a seatbelt. Plaintiff

received a one-day suspension without pay and was informed that additional seatbelt violations would result in progressive discipline, up to and including termination.

On June 19, 2021, the Union filed a grievance on Plaintiff's behalf, arguing again that the seatbelts are too dangerous to wear while operating a METRO bus. During the same month, METRO conducted a seatbelt check on all buses, all of which had functional seatbelts with no issues. On July 28, 2021, while the grievance related to Plaintiff's suspension was still pending, METRO received a complaint from a passenger about an interaction that occurred with Plaintiff on his bus. METRO pulled and reviewed the video footage of the incident and observed Plaintiff operating his bus without wearing a seatbelt.

On July 29, 2021, Plaintiff took intermittent FMLA leave due to a gout "flareup." Several years prior to his termination, Plaintiff was diagnosed with gout in his foot, which would flare up unpredictably and cause debilitating pain. Plaintiff successfully applied to be certified for intermittent FMLA leave because of his gout attacks and took his full allotted twelve weeks of intermittent leave in 2019, and again in 2020.  At some point, METRO contracted with a third party to handle the administration of FMLA claims, but Plaintiff was never denied intermittent FMLA leave when he requested it, other than when he had already fully exhausted his allotted leave.

On July 30, 2021, Plaintiff was placed out of service pending a probable discharge hearing for his fifth violation of the seatbelt policy.  On August 5, 2021, METRO held Plaintiff's probable discharge hearing, with Plaintiff and his Union representatives present. At the hearing, Plaintiff argued his seatbelt nonuse should be excused because other unnamed METRO drivers had unspecified instances of getting stuck in seatbelts, which would be a safety hazard if he was ever attacked by a passenger. During his tenure at METRO, Plaintiff had never

4

been attacked or injured by a passenger. Following the probable discharge hearing, METRO terminated Plaintiff's employment based on his persistent violations of the seatbelt policy. The Union filed a grievance over Plaintiff's termination. On August 24, 2021, a hearing was held for the grievance, with Plaintiff and his Union representatives present. At the hearing, Plaintiff acknowledged his obligation to comply with all applicable rules, regulations, and laws regarding seatbelt use. METRO ultimately denied the grievance and upheld Plaintiff's termination. Plaintiff asked the Union to challenge his termination in arbitration.  The Union voted against doing so, determining Plaintiff's termination for seatbelt noncompliance was legally sound.

Standard of Review

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry is the threshold inquiry of determining whether there is a need for trial -- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be invoked carefully so that no person will be improperly deprived of a trial of disputed factual issues.  *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*, 444 U.S. 991 (1979).  The Eighth Circuit set out the burden of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the moving party for summary judgment is only to demonstrate, *i.e.*,"[to] point out to the District Court," that the record does not disclose a genuine dispute on a material fact.  It is

> enough for the movant to bring up the fact that the record does not
> contain such an issue and to identify that part of the record which
> bears out his assertion.  Once this is done, his burden is discharged,
> and, if the record in fact bears out the claim that no genuine dispute
> exists on any material fact, it is then the respondent's burden to set
> forth affirmative evidence, specific facts, showing that there is a
> genuine dispute on that issue.  If the respondent fails to carry that
> burden, summary judgment should be granted.

*Id.* at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-274 (8th

Cir. 1988) (citations omitted) (brackets in original)).  Only disputes over facts that may affect the

outcome of the suit under governing law will properly preclude the entry of summary judgment.

*Anderson*, 477 U.S. at 248.

Discussion

A plaintiff alleging race discrimination may survive summary judgment either by direct

evidence, or by creating an inference of discrimination under the *McDonnell Douglas* burden-

shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

Here, Plaintiff presents no direct evidence, so the *McDonnell Douglas* framework applies.[1]

Under this framework, to establish a prima facie race discrimination claim, an employee must

show 1) that he was a member of a protected class, 2) that he met the employer's legitimate

employment expectations, 3) that he suffered an adverse employment action, and 4) that the

circumstances give rise to an inference of discrimination based on race. *Grant v. City of*

*Blytheville, Arkansas*, 841 F.3d 767 (8th Cir. 2016).

Under *McDonnell Douglas*, the plaintiff initially has the burden to establish a prima facie

case of discrimination. The burden then shifts to the defendant to provide a legitimate,

---

[1] "The *McDonnell Douglas* burden-shifting framework governs claims of race discrimination under Title VII and Section 1981.*"  Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1196 (8th Cir. 2006).

nondiscriminatory reason for its decision. "If the defendant provides such a reason, the presumption disappears, and the burden shifts back to the plaintiff to show that the proffered reason was pretext" for discrimination. *McDonnell Douglas*, 411 U.S. at 804.

Plaintiff cannot meet the third or fourth prong of the analysis. It is undisputed that Plaintiff knew that both the METRO policy and law required the use of seatbelts while driving his bus yet he repeatedly failed to do so. Plaintiff received written warnings, verbal counseling, suspension and ultimately termination for violating the seatbelt policy. Plaintiff argues that his seatbelt non-use should be excused and that METRO employee Joe Barsocchi was similarly situated and not terminated. Specifically, in December 2018, Barsocchi was involved in an accident with a school bus while driving his fixed route and he was placed on unpaid leave for two and a half months. Thereafter, in February 2020 Barsocchi was involved in a second accident which resulted in his suspension without pay. Baroscchi was disciplined for both incidents by Director of Operations Donna Bowers. The Court finds that Barsocchi was not similarly situated to Plaintiff. Barsocchi was involved in two traffic violations in the span of more than one year and in each instance was disciplined. In contrast, Plaintiff violated METRO's seatbelt policy on at least five separate occasions in a nine month span and received escalating disciplinary actions for each instance. Further, Plaintiff was ultimately terminated by John Bohannon. "The test for whether employees are similarly situated ... is rigorous." *Cronquist v. City of Minneapolis*, 237 F.3d 920, 928 (8th Cir. 2001). Plaintiff bears the burden of showing that employees used for comparison are similarly situated in all relevant respects. *Ghane v. West*, 148 F.3d 979, 982 (8th Cir. 1998). "The individuals used for comparison must have dealt with the same supervisor, have been subjected to the same standards, and engaged in

the same conduct without any mitigating or distinguishing circumstances." *Morgan v. A.G. Edwards & Sons, Inc.*, 486 F.3d 1034, 1043 (8th Cir. 2007).

Finally, even if Plaintiff were able to present a *prima facia* case of race discrimination, METRO has proffered a legitimate, non-discriminatory reason for his discharge and Plaintiff has failed to prove pretext.   "Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination." *Putman v. Unity Hearth Sys*, 348 F.3d 732, 736 (8th Cir. 2003)(citations omitted).

Plaintiff's FMLA interference claim likewise fails.  There is no dispute that Plaintiff was on FMLA leave when he was terminated.  However, "[i]f an employer were authorized to discharge an employee if the employee were not on FMLA leave, the FMLA does not shield an employee on FMLA leave from the same, lawful discharge."  *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 978 (8th Cir. 2005)

Conclusion

For these reasons, Defendants' motion for summary judgment (docket # 19) is GRANTED.

IT IS SO ORDERED this 29th day of November, 2023.

_____
James M. Moody Jr.
United States District Judge

8